NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT


TAMMY BROWN,                          )
                                     )
            Appellant,               )
                                     )
v.                                   )          Case No. 2D13-2274
                                     )
STATE OF FLORIDA,                    )
                                     )
            Appellee.                )
_____)

Opinion filed January 7, 2015.

Appeal from the Circuit Court for Pasco
County; William R. Webb, Judge.

Howard L. Dimmig, II, Public Defender, and
Richard J. Sanders, Assistant Public
Defender, Bartow, for Appellant.

Pamela Jo Bondi, Attorney General,
Tallahassee, and Susan D. Dunlevy,
Assistant Attorney General, Tampa, for
Appellee.


KHOUZAM, Judge.

        Tammy Brown was found guilty of felony cruelty to animals after a Chow

mix named Harley was found near Ms. Brown's mobile home emaciated and suffering

from several long-term conditions that had gone untreated.  Adjudication was withheld,

and Ms. Brown was sentenced to six months of community control followed by three years of probation. She timely appeals, raising several arguments. We affirm, writing only to address her claim that the trial court erred in denying her motion for judgment of acquittal because a felony conviction for animal cruelty under section 828.12(2), Florida Statutes (2011), could not be based on an omission or failure to act.

I.     BACKGROUND

The record shows that on November 17, 2011, Robin Long, an animal control officer, found Harley across the street from Ms. Brown's mobile home. He was lying in the grass between the street and the outside of the chain link fence on a neighboring property. Ms. Long observed that Harley's eyes were oozing a green substance. His ears were covered in a crusty substance, contained several bugs, and were missing fur. A large tumor was hanging from his neck. The skin on his entire body was dry, cracked, and missing fur—if he tried to move, his skin would break open and bleed. He was so lethargic that when Ms. Long first saw him she thought he was dead. He had lumps from being immobile. He was emaciated; his hips and ribs were sticking out. Ms. Long did not find any food, water, or shelter for Harley at Ms. Brown's residence. The neighbors indicated that they had fed him that day, pointing to an empty bowl. Harley was covered in ointment, but that particular type of ointment was not effective for any of Harley's conditions.

The neighbors put Ms. Long in contact with Ms. Brown. According to Ms. Long, Ms. Brown told her that Harley was twelve or thirteen years old and that she had owned him his entire life. But according to Ms. Brown, she told Ms. Long "right from the start" that she did not own Harley and explained that Harley belonged to Kenneth Ward,

her ex-boyfriend.  Ms. Long testified that Ms. Brown did not mention Mr. Ward.  Ms. Brown surrendered Harley to Pasco County Animal Services, signing a release form as his owner and paying a $40 fee for his transportation and board.  Ms. Brown claimed that Ms. Long tricked her into signing the form.

According to a veterinarian who treated Harley, his conditions were causing him severe pain and had been obvious for a long time, developing over months if not years.  His eyes were infected.  His ears were infected to the point that his ear canals were hardened and almost entirely closed.  He had advanced heartworm disease, terrible skin mites, and hookworms so severe that he was anemic.  He had several tumors, including a large one on his neck.  Pictures introduced into evidence confirmed that Harley's conditions were not only serious but also readily observable, even to someone without any veterinary expertise.  Because together these conditions were causing Harley to suffer, he was euthanized five days after Animal Services picked him up.

Ms. Brown's defense was that Harley was owned by her boyfriend, Kenneth Ward.  They brought Harley with them when they moved into the mobile home in 2000, but when Mr. Ward left in 2008 or 2009, he refused to take Harley with him.  Ms. Brown did not have enough money to take care of Harley, so her neighbors would throw food out for him when they could.  Harley would sleep on the neighbor's porch or in the neighbor's barn.  She would buy dog food for Harley and give it to her neighbors when she was able.  On the day Animal Services came, she bought ointment for Harley's skin because her neighbor had told her Harley's chest area was irritated.  At the time, she had been living elsewhere (about eight miles away) with a friend for

eleven months.  She said Harley was a happy-go-lucky dog and she had never seen him in pain.  She never took Harley to a veterinarian for any of his conditions, and she felt it was not her right to take Harley to Animal Services because he was a happy dog.

Two neighbors as well as Ms. Brown's son testified that Harley was a very happy dog who did not appear to be in any pain.  The neighbors believed that Harley's condition was not serious enough to warrant veterinary attention, and his condition had not changed on the day Animal Services took him.  Ms. Brown's son, John Brown, indicated that Harley was fed by "[a]nybody the dog went to" and slept "[a]nywhere he wanted."  Mr. Brown stated that Harley was a playful dog; taking him to Animal Services would have been "kind of heartless."  He acknowledged that Harley did have "heat spots" but stated that he never saw Harley in any pain or noticed Harley having any difficulty getting around.  He claimed he had not seen the tumor on Harley's neck.

II.     SUFFICIENCY OF THE EVIDENCE

Ms. Brown argues that the evidence was insufficient to support a finding of guilt because the statute in effect at the time she committed the offense did not prohibit omissions.  Section 828.12(2), Florida Statutes (2011), provided as follows:

> A person who intentionally commits an act to any animal which results in the cruel death, or excessive or repeated infliction of unnecessary pain or suffering, or causes the same to be done, is guilty of a felony of the third degree, punishable as provided in s. 775.082 or by a fine of not more than $10,000, or both.

This court has held that a defendant can be properly charged with felony animal cruelty under this version of section 828.12(2) for intentionally committing an act that resulted in excessive or repeated infliction of unnecessary pain or suffering to an animal by failing

- 4 -

to provide adequate food, water, or medical treatment.  See State v. Morival, 75 So. 3d 810, 810-12 (Fla. 2d DCA 2011).  Indeed, in Morival, this court determined

> that the legislature properly distinguished between cases in which an owner fails, for example, to provide food for a dog for a few days while the owner goes on vacation—which is surely no more than depriving the dog of necessary sustenance [a misdemeanor under section 828.12(1)]—and cases in which an owner does not feed a dog or feeds a dog so little that it suffers malnutrition over an extended period such that the animal loses a high percentage of its normal body weight [a felony under section 828.12(2)].

Id. at 812.

Additionally, in Hynes v. State, 1 So. 3d 328, 329 (Fla. 5th DCA 2009), the special concurrence explained that the trial court's conclusion that a defendant could not be convicted of a felony under section 828.12(2) for an omission was "dangerously wrong":

> Despite the trial court's expressed difficulty with the construction of this statute, the statutory scheme is clear.  If a person does the acts described in subsection one, he has committed a misdemeanor.  If, however, the person intentionally commits an act which results in a cruel death or in excessive or repeated pain or suffering, a felony is committed.  In other words, it is a misdemeanor to fail to feed a dog under the described circumstances; it is a felony to starve a dog to death, or deprive it of sustenance to the point where, like Pepsi [the dog], it has no muscle mass and is too weak even to stand.

Id. at 330-31 (Griffin, J., specially concurring).

Thus, the trial court did not err in denying Ms. Brown's motion for judgment of acquittal where competent, substantial evidence was presented to show that she owned Harley and that she failed, over a period of more than a year, to provide adequate food and water and needed medical care for him.  Her neglect resulted in Harley's condition visibly deteriorating to the point that he was severely debilitated and

- 5 -

in serious pain. His skin was dry and cracked, bleeding any time he moved. He was so malnourished that his hips and ribs were protruding. His eyes and ears were observably infected. He had heartworms, skin mites, and hookworms. He had several tumors, including a large tumor that hung from his neck. Ultimately, Harley had to be euthanized due to his condition.

It is true that in <u>Morival</u> the defendant had confined the dogs to cages and did not feed them even though there was a large bag of dog food in his apartment. Ms. Brown, on the other hand, did not confine Harvey and claims that she did not have the funds to buy dog food on a regular basis. But we believe these differences do not change the result here. There was ample evidence that Ms. Brown failed to provide him access to sufficient food, water, and medical care to the point that he suffered for an extended period of time and ultimately had to be euthanized due to his atrocious condition. Considering this evidence, the question of whether Ms. Brown was guilty of felony animal cruelty was for the jury—and the jury rejected Ms. Brown's version of events, instead finding that her failure to act was egregious enough to warrant a conviction.

Ms. Brown also contends that the 2013 amendment of section 828.12(2) reveals that the 2011 version of the section did not include omissions. In 2013, the Florida Legislature amended this section to read:

> (2) A person who intentionally commits an act to any animal, <u>or a person who owns or has the custody or control of any animal and fails to act</u>, which results in the cruel death, or excessive or repeated infliction of unnecessary pain or suffering, or causes the same to be done, commits aggravated animal cruelty, a felony of the third degree, punishable as provided in s. 775.082 or by a fine of not more than $10,000, or both.

- 6 -

§ 828.12, Fla. Stat. (2013) (emphasis added). It is true that there is "a well-established presumption that the legislature intends to change the law when it amends a statute." Hill v. State, 143 So. 3d 981, 986 (Fla. 4th DCA 2014). But "at times, a mere change in the language of a statute 'does not necessarily indicate an intent to change the law' because the intent may be to clarify what was doubtful and to erase misapprehension as to existing law." Id. (quoting State ex rel. Szabo Food Servs., Inc. of N.C. v. Dickinson, 286 So. 2d 529, 531 (Fla. 1973)). Here, the legislature has confirmed that the change to section 828.12(2) was meant to "specify[] that a person who owns or has custody or control of any animal and fails to act commits aggravated animal cruelty if certain injuries or death result." Ch. 2013-245, Preamble, at 2826, Laws of Fla. (emphasis added). And, as already explained, the case law that existed prior to the 2013 amendment held that failure to act was covered by section 828.12(2). See Morival, 75 So. 3d at 812; see also Hynes, 1 So. 3d at 330-31 (Griffin, J., specially concurring). Accordingly, we conclude that the 2013 amendment to section 828.12(2) did not change the law but rather clarified the legislature's intent and the existing state of the law that failure to act can be the basis for a felony cruelty-to-animals conviction.

The concurrence suggests that Harley would have inevitably been euthanized no matter when Ms. Brown took him to a shelter and that we are suggesting Ms. Brown needed to provide Harley with care that she could not afford. On the contrary, if Ms. Brown had taken Harley to a shelter before his conditions progressed, it is possible that he may have received treatment instead of being euthanized. This is true even though Harley was an old dog. The problem here is that Ms. Brown failed to seek any competent treatment for Harley for an extended period of time when his

conditions were readily observable and certainly causing him significant pain. We are not suggesting that she needed to expend her meager funds to provide Harley with extensive medical care.

We are sympathetic to the concerns Judge Altenbernd raises about punishing Ms. Brown, an indigent, disabled woman, for failing to care for a dog abandoned by her ex-boyfriend. But we cannot decide the legal issue before us any differently simply because we may question the State's decision to charge Ms. Brown with felony animal cruelty for this offense or the State's choice not to prosecute Mr. Ward. Judge Altenbernd acknowledges that the version of section 828.12(2) in effect at the time Ms. Brown was charged did not require the State to prove ownership. We would like to point out that the 2013 amendment clarified that "a person who owns or has custody or control of any animal" may be convicted of animal cruelty for failure to act. Ultimately, there was evidence to support a finding that Ms. Brown did indeed consider Harley her dog, that she had control over him, and that she failed to provide him basic care or sustenance for an extended period of time, resulting in his egregious conditions.

Affirmed.

VILLANTI, J., Concurs.
ALTENBERND, J., Concurs with opinion.

ALTENBERND, Judge, Concurring.

Having reached an age where I can readily identify with an old, worn-out dog, as a matter of personal morality, I believe it would have been ideal if Harley could have spent his final years in an upper-middle-class home surrounded by a loving family and in the care of a great veterinarian. But I am very troubled by the application of section 828.12(2), Florida Statutes (2011), to the facts of this case. If the issue discussed in this concurrence were preserved, it is unlikely that I would concur in this opinion. I am not entirely convinced that the recent amendments to this statute have solved the problems raised by this case.

The defendant, her son, and two of her neighbors confirmed that Mr. Ward was understood to be the original owner of this dog. He abandoned the dog at Ms. Brown's residence when he left. He has not been prosecuted. Ms. Brown provided some food and care for the dog during the several-year period after Mr. Ward left. The neighbors, however, freely admit that they also fed and gave water to this animal. It had access to their barn, slept on their front porch, and was actually found by the animal control officer on the roadway easement in front of their property. The neighbors confirm that Ms. Brown had not been living in her mobile home for months at the time the animal control officer arrived to check on this dog.

The photographs in the record certainly show a very old, beat up, mixed-breed dog. They also show a collar on the dog with some type of a metal tag. The animal control surrender form states that the dog had a collar but no license or tag. The State never proved that Ms. Brown ever obtained a Pasco County tag for this dog. We have no knowledge about who, if anyone, ever registered as the owner of this dog.

The State's information, tracking the language of the statute, claimed that Ms. Brown committed felony cruelty to an animal sometime between January 1 and December 31, 2011. Its case consisted of testimony from the animal control officer who picked up the dog in November 2011 and the veterinarian who examined the dog at that time. The dog had long-standing skin issues and a large neck tumor when examined. It had heart worms and hook worms. But the State does not clearly articulate what conduct Ms. Brown did or failed to do in the relevant period. There is little question that this woman on disability could not afford to pay for extensive veterinary treatment for this dog. Presumably, it is the State's position that she was supposed to take the dog to the pound during that year so it could be euthanized, i.e., killed, sooner.

The legal issue that troubles me in this case is the fact that the applicable statute did not require the State to prove beyond a reasonable doubt that Ms. Brown was the owner of or otherwise had a legal duty to care for this dog. At the time of this offense, section 828.12(2) was a felony that could be committed by "a person." When your neighbor severely beats your dog with a tire iron for sleeping in his yard, I have no problem with the idea that your neighbor can be a felon.

I am the author of State v. Morival, 75 So. 3d 810 (Fla. 2d DCA 2011), which is discussed in the majority opinion. In that case, the two dogs were caged inside an apartment. The dogs, who were not elderly, were skin and bones despite a bag of food in the apartment. There was no issue raised in Morival, which reversed a pretrial dismissal of the State's information, about whether the person in exclusive custody of the caged dogs had a legal duty to feed them or whether the statute was defective for failing to require proof of ownership for some types of cruelty. But when a crime of

animal cruelty is a matter of failure to provide care for an animal that has roamed freely in a neighborhood for a long time, I believe that a criminal statute needs to define more clearly when the legal duty of care arises.

The motion for judgment of acquittal in this case did not argue that the State was required to prove ownership or that the statute was unconstitutional in the absence of that requirement. Ms. Brown did not propose any special instructions about ownership. Accordingly, this case went to the jury under instructions that merely required the State to prove that she was a person who committed "any act, omission, or negligence whereby unnecessary or unjustifiable pain or suffering" was caused to this dog. Under that standard, I reluctantly conclude that the State met its burden.

The humane care and treatment of animals is a moral imperative that does and should define our American culture. But when we point a finger of blame at this disabled woman for her failure to euthanize what seemingly had become a neighborhood dog, we should accept that we are pointing three fingers at ourselves. It seems that women too often suffer adverse legal consequences when men abandon the women, leaving behind economic problems for which the men ought to take personal responsibility. I am not very convinced that third-degree felony prosecutions of indigent women for failure to care for or to euthanize the abandoned dogs of boyfriends is the most effective method to implement our cultural moral imperative.